**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **FRANK B.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 18 C 2099** |
| **v.** ) | |
| ) | **Magistrate Judge Finnegan** |
| **ANDREW M SAUL,** ) | |
| **Commissioner of Social Security,**[1] ) | |
| ) | |
| **Defendant.** ) | |

## <u>ORDER</u>

Plaintiff Frank B. filed this action seeking review of the final decision of the Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's claim for supplemental security income ("SSI") under Title XVI of the Social Security Act. (Doc. 1). The parties consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the case was reassigned to this Court. (Docs. 8-9). Plaintiff has now filed a Memorandum requesting that the Commissioner's decision be reversed and the case be remanded for further proceedings (Doc. 10), and the Commissioner has responded with a Motion for Summary Judgment asking that the decision be affirmed. (Doc. 18). After careful review of the record and the parties' respective arguments, the Court concludes that the Commissioner's decision denying Plaintiff's SSI application was supported by substantial evidence for the reasons explained below. Accordingly, Plaintiff's request for remand is denied, and the Commissioner's Motion for Summary Judgment is granted.

---

[1] Commissioner Saul is substituted for his predecessor, Nancy A. Berryhill, pursuant to Fed. R. Civ. P. 25(d).

## BACKGROUND

### I.      Procedural History

Plaintiff protectively filed his SSI application on July 30, 2014, claiming disability beginning on January 3, 2010, due to bad teeth, sickle cell, bad prostate, irregular heartbeat, and dizziness.  (R. 63-64, 146-51).[2]  Although he claimed disability dating back to January 2010, the application sought benefits beginning after July 2014, as SSI benefits are not payable until the month after the application's filing date.  20 C.F.R. 416.335.  Plaintiff was 39 years old when his application was filed, which is defined as a younger individual age 18-49.  (R. 30, 64).  *See also* 20 C.F.R. 416.963.

The application was denied initially on October 7, 2014 (R. 81-84) and on reconsideration on June 23, 2015.  (R. 89-92).  Plaintiff then requested a hearing (R. 94-96), which was held before Administrative Law Judge ("ALJ") Luke Woltering on November 3, 2016, where Plaintiff was represented by counsel.  (R. 37).  Both Plaintiff and Vocational Expert ("VE") Cheryl Hoiseth testified at the hearing.  (R. 38).  The ALJ denied Plaintiff's claim in a decision dated April 7, 2017, finding Plaintiff has a residual functional capacity ("RFC") to perform light work with certain restrictions as described to the VE, and could perform several jobs (housekeeper cleaner, cafeteria attendant, and laundry worker) which existed in significant numbers in the national economy.  (R. 20-31).

Plaintiff sought review with the Appeals Council (R. 144-45), but that request was denied on January 30, 2018 (R. 1-6), rendering the ALJ's April 2017 decision final and reviewable by this Court.  *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).  Plaintiff now makes the following arguments for reversal:  (1) the ALJ improperly assessed the

---

[2]      Citations to the Certified Copy of the Administrative Record filed by the Commissioner (Doc. 7) are indicated herein as "R."

medical opinions of the agency consultative and non-reviewing examiners; (2) the ALJ failed to consider properly Plaintiff's claimed fatigue and tiredness; and (3) the ALJ applied an incorrect standard when assessing Plaintiff's claimed symptoms as "not entirely consistent with the medical evidence and other evidence in the record." (Doc. 10, at 7-15).  For the reasons explained below, the Court rejects each of these arguments.

## II.    Plaintiff's Educational and Work History

Plaintiff was 34 years old at the time of his alleged disability onset.  (R. 64).  He is single, has no children, and lives in a basement apartment in his aunt's house.  (R. 43, 290).  Plaintiff has an eighth-grade education completed in 1997 (R. 166) and last worked part-time in 2010 as a self-employed carpet cleaner with his brother.  (R. 44, 319).  He did this work two to four hours a day two to three times a week for about eight years, and claims that he gave it up due to joint pain and fatigue, and that his health prevented any other work.  (R. 171, 178).  As Plaintiff has not worked since 2010, he has engaged in no substantial gainful activity since filing his application.  (R. 22, 159-60, 166, 171, 178).

## III.   Plaintiff's Medical History

### A.    Plaintiff's Physical Impairments

Although Plaintiff's SSI application cited other impairments (bad teeth, sickle cell, bad prostate, irregular heartbeat, and dizziness), he alleged disability in the proceedings below due to fibromyalgia, rheumatoid arthritis, gout, and degenerative disc disease. (R. 64, 252).  Plaintiff argues that his symptoms of back pain, muscle pain, weakness, and fatigue predated his application.  (Doc. 10, at 1).  The records cited in support of this assertion relate to three visits to the Delnor Community Hospital Emergency Department and a follow up with an internist in the fall of 2011 concerning urinary, abdominal, and prostate issues.  (R. 258-74, 276-80, 346, 377, 380, 394, 398-99).

At the initial visit on September 26, 2011, Plaintiff was diagnosed with acute cystitis and prescribed a course of Cipro. (R. 274). During the second visit on October 23, however, Plaintiff reported that he had not taken the Cipro as directed because it caused diarrhea, and his pain returned after he eventually finished the prescription. (R. 276-77). He complained of abdominal and back pain migrating to his extremities and muscle aches all over, and expressed concern that he had cancer or a mass in his abdomen causing him pain. (*Id*.). To rule out diverticulitis and gallbladder disease, a comprehensive metabolic panel and abdominal and pelvic CT scans were taken, all of which were unremarkable. (R. 277-80). Given these results, Plaintiff was assured he had no acute condition, directed to see an internist, and prescribed Norco for pain in the interim. (*Id*.).

Plaintiff returned to Delnor's ED six days later on October 29, 2011, again complaining of abdominal pain radiating to his back and difficulty urinating, along with rectal pain and fatigue. (R. 279-80). He also repeated his concern about having cancer, and stated he was experiencing swelling in his lower extremities, pointing specifically to his upper thighs which he believed were swollen at the time of this examination. (R. 279-81). But the attending physician (Dr. Christopher Oie) detected no obvious sign of swelling in Plaintiff's lower extremities. (*Id*.). Accordingly, based on Plaintiff's symptoms and the relief he experienced with intermittent use of antibiotics, Dr. Oie concluded that Plaintiff was likely suffering with prostatitis and prescribed another antibiotic (Augmentin) to address it. (R. 280-81, 394). Dr. Oie also advised Plaintiff that "his extensive workups speak strongly against" any sign of cancer, and that he needed to complete his course of antibiotics and follow up with an internist. (R. 281).

Plaintiff next consulted an internist to whom he had been referred (Dr. Algimantas Kerpe, also of Delnor Hospital) on November 14, 2011. (R. 278, 346). He again

complained of urinary discomfort, but declined a rectal exam, and further declined a urinalysis due to cost. (R. 346). Based on the workup done the previous month, which Dr. Kerpe noted was "quite extensive," he again diagnosed Plaintiff with prostatitis, continued him on an antibiotic (Bactrim) to treat it, and directed Plaintiff to follow up if symptoms persisted or as needed. (*Id*.).

## B. Treatment After the Filing of Plaintiff's Application

The record indicates no further complaints regarding Plaintiff's prostatitis or any other condition for the next three years. He then filed his application for SSI benefits in July 2014 and underwent a medical consultative examination with Dr. Liana Palacci on September 24, 2014. (R. 290-93). Dr. Palacci noted Plaintiff's history of cystitis and prostatitis, and Plaintiff complained of urination difficulties, pain radiating to his back and testicles, weakness, and dizziness. (*Id*.). During a physical examination, however, Dr. Palacci found normal strength and range of motion in Plaintiff's upper and lower extremities, a non-antalgic gait without an assistive device, and normal grip strength and use of his hands. (*Id*.). Dr. Palacci therefore diagnosed a history of recurrent prostatitis with recurrent symptoms and obesity (Plaintiff was 5'11" and weighed 286 pounds). (*Id*.). Shortly after this examination, Plaintiff sought treatment with the following physicians.

### 1. Dr. Estefan Roy

On December 18, 2014, Plaintiff saw Dr. Estefan Roy of the Family Health Center in Chicago for a check-up and complaints of headache and body pain. (R. 298-99). In the Admitting Evaluation form for this visit, Dr. Roy noted a complaint of chronic knee pain and a history of prostate disease, chest pain, dizziness/fainting, and headache. (*Id*.). Several months later on May 5, 2015, Plaintiff visited the Delnor ED, complaining of lower back pain, dizziness, and fatigue. (R. 391). He was diagnosed with low back pain and

tiredness, prescribed Antivert for the dizziness, and directed to follow up with a family medicine physician. (*Id.*). Three days later, Dr. Roy ordered an x-ray of Plaintiff's lumbar spine, which was normal. (R. 363).

The next month, on June 11, 2015, Dr. Roy ordered x-rays of Plaintiff's right knee, foot, hand, and wrist, listing a diagnosis of rheumatoid arthritis. (R. 353-56). But these images were also normal, except for a small spur and calcification noted at the insertion of the achilles tendon on Plaintiff's right foot. (*Id.*). Five months after these x-rays, on November 16, 2015, Dr. Roy completed a Return to Work/School Note stating that Plaintiff "has a hard time" with "standing and walking for a long time." (R. 348).

### 2. Dr. Fadi Habib

Shortly after Plaintiff's May 5, 2015 visit to the Delnor ED (R. 391) and the May 8, 2015 lumbar x-ray ordered by Dr. Roy (R. 363), Plaintiff sought treatment with a urologist located at the same address as Dr. Roy's Family Health Center, Dr. Fadi Habib. In an initial appointment on May 19, 2015, Dr. Habib noted Plaintiff's complaints of abdominal and pelvic pain, tenderness and pain in his genitals, and difficulties with urination, along with lower back pain, muscle aches and weakness, and swelling of the extremities. (R. 312-14). A physical examination revealed edema in Plaintiff's right hand and left leg, but he reported no current back or joint pain, arthralgias, or fatigue. (*Id.*). Dr. Habib diagnosed prostatitis, for which he prescribed Levaquin. (R. 315).

Plaintiff saw Dr. Habib again on October 20, 2015. (R. 366-68). Although he reported continuing joint pain, back pain, and arthralgias, his pain was better at the time of this appointment; he had no edema, swelling in the extremities, muscle aches, weakness, or fatigue; and he was thus "[m]uch better overall." (*Id.*). Dr. Habib repeated

his diagnosis of prostatitis and prescribed Flomax to treat Plaintiff's nocturia (need to urinate during the night).  (R. 366).

### 3.    Dr. Winston Sequeira

A month after Plaintiff first consulted Dr. Habib, he next began treatment with a rheumatologist, Dr. Winston Sequeira of Rush University Hospital, upon referral from Dr. Estefan Roy.    (R. 435).    During his first appointment on June 23, 2015, Plaintiff complained of pain in his joints and lower back, and stated that he had stopped working due to the joint pains and fatigue.  (R. 435-40).    Based on a physical examination, however, Dr. Sequeira noted that while Plaintiff grimaced with movement of his joints, he had full range of motion and no tenderness in the joints of his upper extremities (shoulders, elbows, wrists, and hands) and lower extremities (hips, knees, ankles, and toes), as well as normal proximal and distal muscle power.  (R. 437).  Dr. Sequeira also reviewed x-rays of Plaintiff's pelvis and lumbar spine taken that day.  The pelvic x-ray was within normal limits (R. 337, 437), and the lumbar x-ray indicated minimal retrolisthesis of L5 over S1, mild facet arthropathy at L4-5 and L5-S1, and was otherwise unremarkable. (R. 336, 438).    Based on these results, Dr. Sequeira concluded that Plaintiff had no "objective signs of joint disease" and recommended that he take an over the counter medication (500 mg Naprosyn) twice a day as needed.  (R. 440).

The next day (June 24, 2015), Plaintiff again visited Delnor's ED complaining of leg and knee pain (R. 386), and x-rays of his knees and left foot were taken.  (R. 333-35, 340-42).  The right knee x-ray indicated a small bony spur and possible tendinopathy at that location, and both knee x-rays showed a slight heterogeneity that could represent some nonspecific inflammation, but there were no fractures or dislocations, and the joint spaces of both knees appeared normal.  (*Id*.).  Plaintiff was diagnosed with bilateral leg

pain and a knee sprain, prescribed tramadol for pain, and directed to follow up with his primary doctor. (R. 386).

Two weeks later on July 9, 2015, Plaintiff returned to Dr. Sequeira, complaining of joint pain rated at 7.5 on a scale of 1 to 10, primarily in the knees, ankles, back, and shoulders, tenderness in all 18 fibromyalgia points, and fatigue. (R. 443). But a physical examination again indicated no edema and full range of motion and strength in all of Plaintiff's extremities. (R. 444, 447). Dr. Sequeira also opined that the previous x-rays of Plaintiff's hands, wrists, and knees were "essentially normal," and that he was "unable to appreciate" any calcification at the achilles tendon noted on the previous x-ray of Plaintiff's right foot. (R. 338, 446-47). The blood tests taken at Plaintiff's last appointment also indicated no autoimmune disorder. (R. 446-47). Based on these findings and the prior x-rays of Plaintiff's pelvis and lumbar spine that also showed no objective signs of joint disease, Dr. Sequeira concluded that the etiology of Plaintiff's joint pain "has been unidentifiable," but his diffuse tender points were "consistent with fibromyalgia," for which Dr. Sequeira prescribed Elavil. (*Id*.). He also recommended that Plaintiff increase his activity level with stretching, swimming, and walking, and follow up in three months. (*Id*.).

Plaintiff next visited Dr. Sequeira on October 13, 2015. (R. 449). He reported feeling better for about a month after starting the Elavil prescribed at his last visit, but still complained of fatigue and pain in his hands, elbows, shoulders, knees, feet, and lower back. (*Id*.). Plaintiff also reported that his legs swell with any activity, and brought photos showing swelling in his feet and one of his hands. (*Id*.). But again, Dr. Sequeira's physical examination indicated no swelling or tenderness, full range of motion in Plaintiff's upper and lower extremities, and normal proximal and distal muscle power. (R. 451). Dr. Sequeira thus reported that Plaintiff's examination was "normal other than multiple tender

points over the muscles and complaints of pain with movement of his knees." (R. 454). He therefore continued the same medications and directed Plaintiff to return if he experienced any joint swelling so that his knee could be aspirated "to exclude gout," since Plaintiff's recent uric acid level was borderline. (*Id*.).

Plaintiff saw Dr. Sequeira again on March 3, 2016, complaining of fatigue, severe pain in his upper back, and recent swelling over his entire body. (R. 455-56). He explained that he had not come to see Dr. Sequeira at the time as he was directed to do because he had no one to bring him in for an appointment, and he brought a photo showing swelling in his hand that reportedly lasted five days. (R. 455). But as before, Dr. Sequeira's physical examination indicated normal proximal and distal muscle power, and full range of motion without swelling in Plaintiff's upper extremities, albeit with complaints of pain and generalized tenderness over his lower back. (R. 457). Dr. Sequeira posited that the recent swelling in Plaintiff's hand might have been due to an acute attack of gout, and noted the need to check Plaintiff's uric acid (which previously tested at the high end of a normal range) to confirm. (R. 430, 454, 457-58).

### 4. Dr. Patricia Roy

Although the record reflects no further appointments with Dr. Estefan Roy after his November 2015 Return to Work Note, Plaintiff continued to see Dr. Patricia Roy (Dr. Estefan Roy's daughter) who practiced in the same office. (R. 49, 465). During an appointment on December 16, 2015, Plaintiff similarly reported recent swelling in his right wrist, knees, and ankles. (R. 465). Dr. Roy diagnosed a rheumatoid arthritis flare and fibromyalgia, and directed Plaintiff to return in two weeks if his symptoms did not improve. (*Id*.). She also completed a Medical Evaluation form for the State of Illinois Department of Health and Human Resources "to determine eligibility for assistance or employability

status." (R. 422-25). In this Evaluation, Dr. Roy noted tenderness and reduced range of motion in Plaintiff's right wrist and mild tenderness in his knees, but that Plaintiff's ambulation was normal. (R. 423). She also reported at most a 20% reduced capacity walking, bending, stooping, climbing, sitting, and pushing; that Plaintiff is able to lift up to twenty pounds at a time and up to ten pounds frequently during an eight-hour day, five days a week; and no physical limitation in his gross or fine manipulation, finger dexterity, or ability to stand or perform activities of daily living. (R. 425).

At his next appointment on May 10, 2016, Plaintiff again complained of pain in his wrists, elbows, and knees, and his right hand was swollen. (R. 464). Plaintiff also reported that his rheumatologist (Dr. Sequeira) had changed his diagnosis from rheumatoid arthritis to fibromyalgia. (*Id*.). Dr. Roy similarly diagnosed fibromyalgia and ordered a test of Plaintiff's uric acid (as Dr. Sequeira had also suggested) which was reported at 7.8 (above the normal range of up to 7.0 or 7.7). (R. 373, 430, 458, 464). Five months later, on October 10, 2016, Plaintiff again visited the Delnor ED, and was diagnosed with acute idiopathic gout at an unspecified site, fibromyalgia, and tiredness. (R. 411-12). He was prescribed allopurinol for the gout and tramadol for pain, and directed to see an internist. (*Id*.).

Plaintiff followed up with Dr. Patricia Roy on October 18, 2016, complaining of swelling in his right heel, lower back pain, muscle spasms, balance issues, and dizziness, among a list of 17 problems. (R. 463). Dr. Roy diagnosed fibromyalgia and fatigue and directed Plaintiff to return in two weeks. (*Id*.). During his next appointment on November 14, 2016, Plaintiff reported that he was no longer seeing his rheumatologist (Dr. Sequeira) because he was told he probably has no autoimmune problem, as his autoimmune workup was all negative. (R. 462). He again complained of fatigue, pain all over his body,

muscle soreness, and dizziness, along with numbness and tingling. (*Id*.). Dr. Roy again diagnosed fibromyalgia, for which she prescribed amitriptyline (Elavil) and referred Plaintiff to physical therapy. (*Id*.).

### C. Agency Opinions

In addition to the foregoing treating physicians, Plaintiff underwent two medical consultative examinations with agency physicians. As noted above, the first was on September 24, 2014 with Dr. Liana Palacci, who diagnosed recurrent prostatitis and obesity. (R. 292). The second was with Dr. Benjamin Lumicao on June 4, 2015. (R. 318-23). When reviewing Plaintiff's history, Dr. Lumicao noted Plaintiff's complaints of swelling off and on in his feet and arms, and joint pain in his lower back, hips, knees, wrists, and hands, all at a level of 8-9 (on a scale of 1 to 10) and increasing with activity. (R. 318). Plaintiff also advised Dr. Lumicao that he had been diagnosed with both recurrent prostatitis and rheumatoid arthritis. (*Id*.).

Dr. Lumicao's physical examination once again revealed full muscle strength, no inflammation, and full range of motion in Plaintiff's hips, knees, and ankles, but tenderness on palpitation of his hips, knees, feet, and hands. (R. 321-22). Plaintiff also had full strength in his upper extremities and full range of motion in his shoulder, elbow, and wrist joints, but complained of pain with all movements. (*Id*.). He also had no swelling in his hands and showed only "slightly reduced" grip strength (4 out of 5 bilaterally) and "mild difficulty in performing manipulations with either hand." (*Id*.). Dr. Lumicao observed that Plaintiff "has some difficulty in movements secondary to his weight" (R. 319) and walks slowly, but without a limp or staggering, does not use an assistive device, and can walk more than 50 feet without assistance. (R. 322). He also noted Plaintiff's claim of "difficulty walking more than 1/2 block because of the joint pains." (*Id*.). Based on this

examination and the information that Plaintiff provided, Dr. Lumicao diagnosed chronic prostatitis, obesity, and hypertension, and further listed rheumatoid arthritis "by history." (*Id*.). He also stated that Plaintiff "has some difficulty in prolonged standing, walking, lifting, and carrying due to obesity and chronic joint pains." (R. 323).

Shortly after Dr. Lumicao's June 2015 examination, a non-examining agency reviewer (Dr. Lenore Gonzalez) relied upon Dr. Lumicao's opinions when considering Plaintiff's RFC during reexamination of Plaintiff's application. (R. 76-77). Dr. Gonzalez opined that Plaintiff is capable of light work (standing and/or walking about six hours during an eight-hour day and lifting up to 20 pounds occasionally and 10 pounds frequently), but has "slightly reduced grip strength and difficulty with manipulations" due to rheumatoid arthritis, and is therefore "best served avoiding more than occasional fine and gross manipulations bilaterally." (*Id*.). When forming these opinions, however, neither Dr. Lumicao nor Dr. Gonzalez had the benefit of the subsequent opinions of Plaintiff's rheumatologist (Dr. Sequeira) ruling out joint disease (R. 440, 446-47, 464) or Plaintiff's family practice physician (Dr. Patricia Roy) stating that Plaintiff has no limitations in standing, gross or fine manipulation, or the finger dexterity of either hand. (R. 425).

## IV. Disposition of Plaintiff's Application

### A. The Administrative Hearing

Plaintiff appeared with counsel at a hearing before the ALJ on November 3, 2016 (R. 37) and testified regarding his muscle and joint pain, prostate problems, stomach irritation, breathing difficulties, dizziness, and fatigue. (R. 45-47). He also described swelling of his feet, ankles, hands, and knuckles, but admitted that his medications (tramadol and gabapentin) provide at least some relief. (R. 45, 49-51). Plaintiff stated that he can sit for about fifteen minutes before needing to change positions, stand for

about ten minutes at a time, walk a quarter of a mile, and lift less than a gallon of milk. (R. 52-53). He also described problems reaching with his right arm and using his hands, such as for buttoning a shirt, opening a jar, writing for long periods, and holding a cup. (R. 55-57). Plaintiff explained that he lives with his aunt and uncle and relies on them for help with cooking, cleaning, taking his medicine, dressing, and bathing (R. 43, 53-55) and depends on his aunt to take him to the doctor. (R. 44, 47). He claimed spending about half the day lying down due to weakness and fatigue (R. 54) and that he has problems focusing, understanding, forgetting, and concentrating. (R. 57-58).

In response to questions from the ALJ, the VE testified about the ability of a hypothetical person of Plaintiff's age and education who could perform light work (lift up to twenty pounds occasionally and ten pounds frequently). (R. 59). The ALJ also added the limitations that such a person be limited to frequent handling and fingering bilaterally, and only occasionally balance, stoop, kneel, crouch, crawl, and climb ladders, ropes, scaffolds, ramps, and stairs. (R. 59). The VE testified that such a person could perform the representative jobs of housekeeper/cleaner, cafeteria attendant, and laundry worker. (R. 59-60). And if the individual were instead limited to occasional hand use, the VE testified that two jobs would still be available – usher and counter clerk. (R. 60). The ALJ also asked the VE about jobs for a hypothetical person of Plaintiff's age and education who was instead limited to sedentary work (lifting up to ten pounds), frequent handling and fingering bilaterally, could occasionally balance, stoop, crouch, and climb ramps and stairs, and could not kneel, crawl, or climb ladders, ropes, or scaffolds. (R. 60). The VE testified that such a person could perform the representative jobs of order clerk, information clerk, and document preparer. (*Id*.). But if such a person were instead limited

to occasional handling and fingering, no jobs would be available. (R. 61). And in all cases, the person would need to be on task about 85% of the workday. (*Id.*).

## B. The ALJ's Decision

The ALJ denied Plaintiff's claim for SSI benefits in his April 7, 2017 decision. Although he found that Plaintiff has several severe impairments (obesity, inflammatory arthritis, gout, fibromyalgia, and lumbar spine degenerative disc disease), the ALJ found no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (R. 22-25). The ALJ also determined that Plaintiff has the RFC to perform light work with frequent handling and fingering bilaterally as described to the VE during the hearing. (R. 26-30). Based on this RFC and the VE's testimony that such a person could perform the representative jobs of housekeeper cleaner, cafeteria attendant, and laundry worker, the ALJ concluded that Plaintiff is able to perform work that exists in significant numbers in the national economy and therefore not disabled. (R. 30-31). Plaintiff now challenges this conclusion, particularly the ALJ's findings that he is capable of the walking and standing requirements of light work and frequent handling and fingering. For the reasons explained below, the Court rejects these arguments.

## DISCUSSION

## I. Governing Standards

## A. Five-Step Inquiry

To recover SSI benefits, a claimant must establish that he is disabled within the meaning of the Social Security Act. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A person is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The following five-step inquiry is required to determine whether a claimant is disabled: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of the impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 404.1520.

### B.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g). But in so doing, the Court may not engage in its own analysis of whether Plaintiff is severely impaired. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may the Court "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). A court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting cases).

In making this determination, the Court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "provide a complete written evaluation of every piece of testimony and evidence." *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)). Still, where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful

review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## II.    Analysis

### A.    The ALJ's Assessment of the Medical Opinions

Plaintiff's first challenges the ALJ's assessment of two agency medical opinions (by consultative examiner Dr. Lumicao and non-reviewing examiner Dr. Gonzalez), as a means to attack the ALJ's finding that Plaintiff is capable of both the standing and walking requirements of light work and the additional limitation of frequent handling and fingering. (Doc. 10, at 7-10). According to Plaintiff, the combination of portions of these two opinions (while rejecting other portions) requires restricting him to sedentary work with occasional hand use, in which case the VE confirmed there would be no jobs and a disability finding would be required. (*Id.*). The Court addresses each argument in turn.

### 1.    Opinions Regarding Plaintiff's Abilities to Stand and Walk

Plaintiff's attempt to avoid the standing and walking requirements of light work relies on the isolated statement in the June 2015 consultative examination report of Dr. Lumicao that Plaintiff "has some difficulty in prolonged standing, walking, lifting, and carrying due to obesity and chronic joint pains." (R. 323). Citing SSR 83-12, Plaintiff argues that "prolonged standing or walking" is "contemplated for most light work," and the difficulty standing and walking noted by Dr. Lumicao is therefore "inconsistent" with the ALJ's finding that Plaintiff can perform light work. (Doc. 10, at 7).[3] From this premise,

---

[3]    Notably, SSR 83-12 makes this observation in the context of addressing an issue not raised here, regarding whether a claimant who must alternate sitting and standing is functionally capable of "the prolonged sitting contemplated in the definition of sedentary work" or the "prolonged standing or walking contemplated for most light work." 1983 WL 31253, at *4 (Jan 1, 1983). As discussed below, however, the functional requirements of light work are set out elsewhere in SSR 83-10, 1983 WL 31251, at *5 (Jan 1, 1983).

Plaintiff argues that the ALJ "reversibly erred" by failing to provide "good explanation" for according only some weight to Dr. Lumicao's opinion "and rendering a functional capacity finding that stood inapposite." (Doc. 10, at 7). The Court disagrees on all points.

Contrary to Plaintiff's assertion, the ALJ provided solid reasons for according Dr. Lumicao's statement that Plaintiff has "some difficulty" with prolonged standing and walking only some (as opposed to full) weight. As even Plaintiff acknowledges, the ALJ explained that this statement is "vague" in its failure "to specify the degree of limitation" that Plaintiff experiences standing or walking. (*Id*.; R. 29). The ALJ also found that this isolated remark only "partially follows from" Dr. Lumicao's physical examination of Plaintiff (R. 29), since his report documented several detailed findings regarding Plaintiff's ability to stand and walk (unaddressed by Plaintiff here) that were more probative of his RFC. As the ALJ discussed, Dr. Lumicao reported that Plaintiff had a slow gait but no limping or staggering and no use of an assistive device, full range of motion and strength in his lower extremities, only mild difficulties getting on and off the examining table and with complex walking exercises, and his straight leg raises were negative. (R. 27, citing R. 321-22). Based on these findings and the prior consultative examination of Dr. Palacci which similarly found full range of motion and strength in Plaintiff's lower extremities (R. 292), the ALJ reasonably found that Plaintiff "is able to stand or walk frequently during a normal workday." (R. 29).[4]

_____

[4]      The Court also notes that Dr. Lumicao's additional statement regarding Plaintiff's difficulty with prolonged walking and standing follows and relates at least partly to Plaintiff's own report during the examination that he "has difficulty walking more than 1/2 block because of the joint pains." (R. 322-23). It is well settled that an ALJ is free to discount such a medical opinion based on a claimant's subjective complaint, even when reported by an agency expert. *See*, *e.g.*, *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019) (ALJ properly discounted agency opinion "based on only one evaluation" that "largely reflected" the claimant's "subjective reporting") (citing and quoting *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (ALJ should rely on medical

As importantly, particularly in light of Dr. Lumicao's additional examination findings, his isolated remark that Plaintiff has "some difficulty" with "prolonged" walking or standing is hardly "inapposite" to the ALJ's light work determination, as Plaintiff now suggests. The full range of light work "requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6. That is precisely what the agency reviewer (Dr. Gonzalez) concluded Plaintiff is capable of doing after fully considering Dr. Lumicao's report. (R. 76-78). On reconsideration of Plaintiff's application, Dr. Gonzalez found that Plaintiff is able to stand and/or walk about 6 hours in an 8-hour workday, and therefore capable of light work. (*Id*). And to support this determination, Dr. Gonzales recited Dr. Lumicao's detailed findings regarding Plaintiff's slow but unassisted gait and full range of motion and strength in his lower extremities, albeit with complaints of muscle aches and joint pain. (R. 76). Dr. Gonzalez's opinion thus demonstrates that Dr. Lumicao's opinion is fully consistent (not "inapposite") with the ALJ's determination that Plaintiff is capable of light work.[5]

Failing to confront Dr. Lumicao's examination findings or Dr. Gonzalez's careful consideration of them, Plaintiff argues that the ALJ should have credited only Dr. Lumicao's isolated statement that Plaintiff has "some difficulty" with "prolonged" walking and standing because it is supported by "other record evidence." (Doc. 10, at 8-9). But

opinions "based on objective observations," not subjective complaints").

[5]  Although Plaintiff himself relies heavily on Dr. Gonzalez's opinion in a different respect (regarding his capacity for fine and gross manipulations), he argues that her opinion regarding Plaintiff's capacity for light work should be disregarded because it "stands in conflict with Dr. Lumicao, an Agency examining physician." (Doc. 10, at 10 n.8). But again, Plaintiff fails to address Dr. Gonzalez's detailed bases for her light work determination, or the fact that those bases came from Dr. Lumicao's report. Dr. Gonzalez's light work determination is thus fully consistent with Dr. Lumicao's opinion, and both are fully supportive of the ALJ's similar determination that Plaintiff is capable of light work.

if anything, the additional evidence that Plaintiff cites reinforces the ALJ's conclusion that Plaintiff is capable of light work. For example, Dr. Sequeira's treatment records similarly show that Plaintiff had full range of motion and an absence of swelling in his lower extremities (R. 437, 440, 444, 451), just as Drs. Lumicao and Palacci found. (R. 292, 321-22). Based on these findings, numerous x-rays demonstrating that Plaintiff's lumbar spine, pelvis, hips, knees, and feet were all essentially normal, and blood tests that showed no sign of an autoimmune disorder, Dr. Sequeira concluded that Plaintiff had no objective sign of joint disease and instead attributed his "unidentifiable" joint pain to fibromyalgia. (R. 440, 446-47). Nor did Dr. Sequeira endorse any limitations in Plaintiff's walking ability. To the contrary, he recommended that Plaintiff increase his activity level with stretching, swimming, and walking. (R. 447).

Plaintiff's reliance on Dr. Estefan Roy's November 2015 to "Return to Work" Note fares no better. While one might guess at the few words scribbled on this form (perhaps: "The bearer has a hard time doing physical work including standing & walking for a long time"), it provides none of the information needed to determine the degree of limitation in walking or standing that Plaintiff experiences or its impact on his ability to work. (R. 348). For instance, Dr. Roy failed to complete the sections indicating the dates to which it applies, whether Plaintiff is "incapacitated" or not, and whether and when he may "return to unrestricted work" or "return to restricted work." (*Id*.). And unlike Dr. Lumicao's detailed report, Dr. Roy's one-line note lacks any other information from which Plaintiff's condition might be discerned. Given its brevity and omissions, the ALJ reasonably discounted this incomplete statement as "generally illegible" and "vague." (R. 29).

The emergency room records on which Plaintiff relies fall short for similar reasons. (Doc. 10, at 9, citing R. 386-87, 411-18). None of these records makes any findings

regarding Plaintiff's physical condition or functional limitations. They merely document a gout episode for which Plaintiff was prescribed medication (R. 411-12) and his complaints of leg and knee pain (R. 386-87), whereas Drs. Palacci, Lumicao, and Sequeira consistently found no swelling and no reduced strength or range of motion in his extremities, and Drs. Palacci and Lumicao found him able to ambulate unassisted. As noted above, treatment notes reporting subjective complaints are insufficient to overcome such objective evidence supportive of the ALJ's determination. *See supra* note 4. Nor was the ALJ required to seek out further specificity regarding potential limitations from any treating or examining physician as Plaintiff now suggests (Doc. 10, at 8), when the record already contained functional assessments sufficient for the ALJ to render a decision. *See Britt v. Berryhill*, 889 F.3d 422, 427 (7th Cir. 2018) (no requirement to re-contact medical expert "for an explanation of the inconsistencies between her report and those of other doctors" where "the record contained adequate information for the ALJ to render a decision") (citing *Skinner v. Astrue*, 478 F.3d 836, 843-44 (7th Cir. 2007)).

In addition to the detailed findings of Drs. Palacci, Lumicao, and Sequeira, Plaintiff's canvassing of the evidence also overlooks the Medical Evaluation conducted by Dr. Patricia Roy in December 2015. (R. 425, 465). Unlike Dr. Estefan Roy's one-line assessment, Dr. Patricia Roy offered specific findings quantifying the degree of limitation in Plaintiff's walking ability, whether due to his obesity or fibromyalgia. For the specific purpose of determining Plaintiff's "employability status," she opined that he ambulates normally (unassisted), has no limitation in his ability to stand, and has at most a 20% reduction in his ability to walk. (R. 423, 425). Like the findings of Drs. Palacci, Lumicao, and Sequeira discussed above, Dr. Patricia Roy's findings are similarly supportive of the ALJ's determination that Plaintiff is capable of light work. *See*, *e.g.*, *Bell v. Apfel*, 221

F.3d 1338, 2000 WL 1015897, at *1-2, 5 (7th Cir. 2000) (medical opinions reporting 20% reduced capacity to walk supportive of light work RFC determination) (unpublished).[6]

## 2. Opinions Regarding Plaintiff's Hand Use

Plaintiff's attack on the ALJ's determination of frequent gross and fine manipulation similarly fails to address several medical opinions and treatment records that support this conclusion. As the ALJ explained, the record includes two opinions regarding Plaintiff's hand use that indicate no impairment. (R. 27-28). During her September 2014 consultative examination, Dr. Palacci found normal grip strength and that Plaintiff was able to make fists, oppose fingers, and perform various manipulative tasks, such as hold coins, turn doorknobs, button shirts, and tie shoelaces. (R. 291-92). Dr. Patricia Roy's December 2015 Medical Evaluation similarly reported no impairment ("Full Capacity") in gross and fine manipulation and the finger dexterity of both hands. (R. 425). Dr. Sequeira's treatment records also indicated repeatedly that Plaintiff had full range of motion and an absence of swelling in each hand, and that the x-rays of his hands and wrists were normal. (R. 437, 440, 446, 451). But the ALJ also considered Dr. Lumicao's finding of "slightly decreased" grip strength (4 out of 5 bilaterally) and "mild difficulty in performing manipulations with either hand" (R. 321), and that Plaintiff sometimes presented with hand swelling. (R. 26-27, citing 314; *see also* R. 464). And Plaintiff documented his swollen hand on other occasions with photographs that he brought to Dr.

---

[6]     Although *Bell* is unpublished and therefore not precedential, the Court is persuaded by its reasoning and that of other district courts in this Circuit that have reached the same conclusion. *See*, *e.g.*, *Cecil v. Colvin*, No. 13-cv-233, 2014 WL 1425871, at *8, 11 (S.D. Ill. April 11, 2014) (reliance on medical opinion rating claimant's ambulation as normal (unassisted) and capacity to walk and stand "as only 20% reduced" supported light work RFC determination); *Penny v. Astrue*, No. 08-2270, 2010 WL 1931312, at *5 (C.D. Ill. May 13, 2010) (medical evaluation that claimant had a 20-50% reduced capacity to walk and stand was consistent with light work RFC determination).

Sequeira. (R. 449, 455). Reasonably balancing all of this evidence, the ALJ found Plaintiff capable of frequent handling and fingering bilaterally. (R. 28-29).

But Plaintiff's challenge features a different piece of evidence – Dr. Gonzalez's non-examination review of Plaintiff's application on reexamination, where she opined that Plaintiff has "slightly reduced grip strength and difficulty with manipulations" due to rheumatoid arthritis, and is therefore "best served avoiding more than occasional fine and gross manipulations bilaterally." (R. 76-77). Once again, Plaintiff argues that the ALJ "provided no supported record basis for supplanting the reasoned judgment of Dr. Gonzalez, an agency expert and medical professional." (Doc. 10, at 10). And once again, the Court disagrees.

As even Plaintiff acknowledges, while the ALJ accepted Dr. Gonzalez's opinion in all other respects, he clearly explained that her basis for restricting Plaintiff to occasional hand use (Dr. Lumicao's June 2015 consultative examination report of "slightly decreased" grip strength and "mild difficulty" with hand manipulations) "does not warrant the extreme reduction of only occasional manipulative activity." (R. 28; *see also* Doc. 10, at 10 and n.8). The ALJ also explained that Dr. Gonzalez "never had the opportunity to examine, or even meet with and question, the claimant." (R. 28). Thus, given the "slight loss of functioning" found by Dr. Lumicao and the "other generally unremarkable physical examinations" of Plaintiff's hands and hand use (which were mostly unavailable to Dr. Gonzalez), the ALJ reasonably found that Plaintiff "would be able to perform handling and fingering frequently, as opposed to occasionally." (R. 28-29). This analysis was more than proper.

Among the evidence unavailable to Dr. Gonzalez at the time of her June 2015 review was Dr. Patricia Roy's December 2015 Medical Evaluation, which found no

impairment in gross or fine manipulation or the finger dexterity of either hand. (R. 425). Dr. Gonzalez also lacked the benefit of Dr. Sequeira's treatment records reporting normal x-rays and blood tests and repeatedly finding no reduced range of motion or swelling of Plaintiff's hands and wrists. (R. 437, 440, 446-47, 451). The records from Dr. Sequeira and Dr. Patricia Roy also discredited the diagnosis of rheumatoid arthritis (R. 440, 446-47, 464) on which Dr. Gonzalez expressly relied in reaching her conclusion that Plaintiff should be limited to occasional hand use. (R. 76: "He was diagnosed with rheumatoid arthritis."; R. 77: "Due to RA the claimant has slightly reduced grip and difficulty with manipulations. He is best served by avoiding more than occasional fine and gross manipulations bilaterally."). The ALJ's decision to discount a non-examining agency opinion rendered in the absence of this full record was not merely reasonable, it was required. "ALJs may not rely on outdated opinions of agency consultant's 'if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion.'" *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (quoting *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018)).

Plaintiff's argument that the ALJ failed to "reconcile" his frequent hand use finding with evidence of Plaintiff's hand and wrist swelling (Doc. 10, at 10) similarly disregards the ALJ's reasoning and the records he cited to support it. As the ALJ explained, Plaintiff testified that medications helped his swelling (R. 28, 51) and reported to Dr. Sequeira that Elavil made him feel better for about a month. (R. 28-29, 449). Plaintiff's suggestion that the ALJ lacked an independent medical assessment to support his conclusion that Plaintiff is capable of frequent hand use during a normal workday (Doc. 10, at 10) also ignores the facts. As the ALJ further explained, Dr. Patricia Roy found Plaintiff had full capacity for gross and fine manipulation and finger dexterity bilaterally "during an 8 hour

workday, five days a week," even while Plaintiff was complaining of hand and wrist swelling, tenderness, and pain. (R. 28, 423, 425, 465). It was the ALJ who, in an abundance of caution and to Plaintiff's benefit, reduced his RFC determination to only frequent hand use to accommodate Plaintiff's complaints of hand swelling. (R. 26-29). This conclusion was more than well supported.[7]

For all of these reasons, the Court finds no error in the ALJ's RFC determination that Plaintiff is capable of frequent gross and fine manipulation. But the Court also notes that any such error would be harmless, since the VE's testimony established that there would still be jobs available even if Plaintiff were limited to light work with occasional hand use. (R. 60). Conversely, any error in the ALJ's determination that Plaintiff is capable of the standing and walking requirements of light work would be harmless, as the VE also established that there would be jobs available for someone capable of only sedentary work but also frequent hand use. (R. 60-61). In sum, Plaintiff must defeat both RFC determinations of light work and frequent hand use to overcome the ALJ's non-disability finding. And this Court finds no error in either.

## B.     The ALJ's Assessment of Plaintiff's Claimed Fatigue and Tiredness

Plaintiff next challenges the ALJ's assessment of his claimed fatigue and tiredness when determining his RFC. Plaintiff argues that these symptoms are "documented throughout the record," and that the ALJ "acknowledged" that fatigue and tiredness are

---

[7]     Plaintiff attempts to discredit Dr. Patricia Roy's assessment of no impairment in gross or fine manipulation or finger dexterity (R. 425) by questioning whether she "tested for manipulative limitations as Dr. Lumicao did." (Doc. 23 at 5). Putting aside the reliability of Dr. Roy's Medical Evaluation (on which Plaintiff himself relies), the argument is moot in any event, since the ALJ discounted Dr. Roy's opinion of no manipulative limitations in order to accommodate both Dr. Lumicao's findings of slightly decreased grip strength and mild manipulative abilities (R. 321, 327) and Plaintiff's complaints of hand swelling. (R. 28-29).

symptoms of his fibromyalgia, but "reversibly erred by failing to continue this assessment to analyze and set forth the vocational impact" of these symptoms. (Doc. 10, at 11). He further contends that this alleged error is outcome determinative, since Plaintiff testified that he needs to lie down each day due to fatigue, and the VE testified that the allowable off-task time for the jobs he listed was only 15%. (*Id*. at 11-12). But as the Commissioner correctly responds, the ALJ repeatedly considered Plaintiff's claims of fatigue and the evidence relating to those complaints, including Plaintiff's testimony, but properly found that the record supports no greater limitations in Plaintiff's RFC. (Doc. 19, at 6-8, citing R. 25-26, 29). The Court agrees that the ALJ properly considered this issue and that his RFC fully addressed the evidence to which Plaintiff now points.

Contrary to Plaintiff's contentions, the ALJ expressly acknowledged his testimony claiming "chronic fatigue" but found that his medical history fails to demonstrate that this symptom (along with the others Plaintiff listed) was as severe as alleged. (R. 26). That conclusion was well supported. As the ALJ explained, Dr. Patricia Roy's December 2015 Medical Evaluation found no physical impairment in Plaintiff's ability to handle daily activities during an 8-hour workday. (R. 28, citing R. 425). Dr. Estefan Roy also noted no issue with daytime drowsiness in December 2014. (R. 299). Dr. Habib similarly indicated in both May and October 2015 that Plaintiff reported no sleep disturbances or fatigue. (R. 313-14, 368). And as the Commissioner notes (and Plaintiff does not dispute), no opinion states that Plaintiff is unable to work due to fatigue. (Doc. 19 at 6).

As the Commissioner also argues (Doc. 19, at 7-88), the treatment records that Plaintiff now claims "documented" his fatigue and tiredness (Doc. 10, at 11) merely recite his complaints of those symptoms. (*E.g.*, R. 45, 54, 196, 280, 435, 443, 449-50, 456, 462). As explained above, it is proper to discount medical records that merely track a

claimant's subjective complaints.  *See supra* note 4; *see also Cooley v. Berrihill*, 738 Fed. App'x 877, 880-81 (7th Cir. 2018) (ALJ was not "required to rely" on treatment notes indicating fatigue that "appear simply to recite [claimant's] own subjective complaints"). And the records Plaintiff cites that indicate a diagnosis of "fatigue" or "tiredness" (*e.g.*, 391, 411, 463) contain no explanation or support for that one-word diagnosis and are thus no more probative.  *See Cooley*, 738 Fed. App'x at 879-80 (ALJ properly discounted treatment records diagnosing fatigue supported only by claimant's subjective report: "An ALJ may discount a doctor's statements that are not adequately explained if the treatment notes do not clarify the doctor's reasoning.").  Nor do any of these records indicate that any fatigue Plaintiff does experience limits his activities.  To the contrary, Dr. Sequeira recommended that Plaintiff increase his activity level, even while acknowledging his claim of fatigue.  (R. 443, 447).

Plaintiff's hearing testimony that he needs to lie down half the day due to weakness or fatigue (R. 54) similarly fails to substantiate that claim in the absence of any corroborating objective evidence.  *See Imse v. Berrihill*, 752 Fed. App'x 358, 360-62 (7th Cir. 2018) (ALJ properly disregarded claimant's hearing testimony of needing to lie down or nap 90 minutes to 4 hours a day 2 to 5 days a week, where "no physician, treating or otherwise, has ever indicated that there was a medical reason why she would need to lay down/nap as frequently as alleged during the day").  As noted above, Plaintiff's medical record not only fails to mention that he spends half the day lying down, it includes several contradictory treatment notes indicating an absence of fatigue, daytime drowsiness, or any difficulty handling daily activities during a normal 8-hour workday.  (R. 299, 313-14, 368, 425).  On this record, there was no need for the ALJ to address Plaintiff's testimony that he spends half of every day lying down.  *See Green v. Saul*, 781 Fed. App'x 522, 528

(7th Cir. 2019) (ALJ not required to address claimant's alleged need to nap two hours every day due to fatigue that was "not supported by evidence other than her testimony, which the ALJ did not credit").

Even Plaintiff does not argue that this uncorroborated testimony requires remand. Rather, he emphasizes "that the ALJ found fibromyalgia a severe impairment and Plaintiff's fatigue and tiredness a symptom of that impairment." (Doc. 23, at 6). But of course, finding an impairment and acknowledging its symptoms do not by themselves require a disability determination, only an analysis of their severity and impact on an ability to work. And contrary to Plaintiff's suggestion, the ALJ did not "fail to set forth an assessment of Plaintiff's fatigue." (*Id.*). As the Commissioner correctly argues (Doc. 19, at 6), the ALJ assessed both Plaintiff's "allegations of diminished activities due to fatigue" and a note submitted by his aunt stating that she "helps him with some of his daily activities like cooking, cleaning, and taking him back and forth to the doctor." (R. 26, 29, 245). But the ALJ reasonably concluded in light of a well-developed medical record that, although Plaintiff may experience some fatigue as a symptom of his fibromyalgia, that symptom is not as severe as he alleged, and instead fully accommodated by an RFC limiting him to light work with other restrictions. (R. 26-30). For all of these reasons, Plaintiff's bare testimony alleging a need to lie down half the day is insufficient to show that the limited RFC determined by the ALJ failed to accommodate his fatigue.

## C.     The ALJ's Evaluation of Plaintiff's Subjective Complaints

Finally, Plaintiff challenges the ALJ's evaluation of his subjective complaints on a wide array of grounds. He argues that the ALJ: (1) applied an "incorrect legal standard" when evaluating his claimed symptoms; (2) failed to explain which symptoms were credited and discredited; (3) improperly relied on objective medical evidence to discredit

his pain and other symptoms; (4) failed to determine "the frequency and duration of gout attacks and the corresponding functional impact"; (5) improperly relied on his conservative treatment without considering his reasons for lack of other treatment; (6) failed to consider the factors required under SSR 16-3p; and (7) misconstrued one of his medical records to suggest symptom exaggeration. (Doc. 10, at 12-15). As explained below, the Court finds no merit in any of these arguments, as each is debunked by a fair reading of the ALJ's decision and the full record which he thoroughly considered.

### 1. The Legal Standard Applied by the ALJ

Plaintiff first takes issue with the legal standard applied by the ALJ when assessing his subjective complaints. According to Plaintiff, the ALJ incorrectly considered whether Plaintiff's claims were "entirely consistent with the medical evidence and other evidence in the record," whereas the regulations require a decision based on "the preponderance of the evidence offered at the hearing or otherwise included in the record." (Doc. 9, at 12, quoting R. 27 and 20 C.F.R. 404.953(a)).[8] But as the Commissioner correctly contends, Plaintiff's argument disregards the ALJ's proper explanation that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 416.929." (Doc. 19, at 11-12, citing R. 26). The ALJ further explained, after fully considering the evidence in keeping with this standard, that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record *for the reasons explained in this decision*" and "have been found to affect the claimant's

---

[8]     Although Plaintiff incorrectly cites § 404.953(a), the same standard is set forth in 20 C.F.R. § 416.1453(a), which applies to SSI claims and therefore the instant case.

ability to work only *to the extent they can reasonably be accepted as consistent with the objective medical and other evidence*." (R. 27, emphasis added). As the Commissioner correctly argues, this explanation demonstrated the ALJ's proper application of the standard required by § 416.929(a), not a deviation from the preponderance standard required by § 416.1453(a). (Doc 19, at 11-12, quoting § 416.929(a): "we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.").

Tellingly, Plaintiff cites no other language in the ALJ's decision suggesting that he misapplied the preponderance standard of § 416.1453(a). And in fact, the ALJ's decision and RFC determination demonstrate that he fully complied with that standard as well. As the foregoing language makes clear, the ALJ did not reject Plaintiff's symptoms if they were merely inconsistent with any piece of evidence, but rather, credited his symptoms "to the extent they can reasonably be accepted as consistent with the objective medical and other evidence" as "explained in this decision." (R. 27). Indeed, to Plaintiff's benefit, the ALJ accepted some of Plaintiff's claimed symptoms in light of the full record, even though they were inconsistent with significant pieces of evidence considered in isolation. As the ALJ explained, although Drs. Palacci and Patricia Roy found full grip strength and hand use (R. 292, 425), he limited Plaintiff to frequent gross and fine manipulation to accommodate his complaints of hand pain and swelling. (R. 27-29). While Drs. Palacci, Lumicao, and Sequeira repeatedly found full range of motion and strength in Plaintiff's upper and lower extremities (R. 292, 321, 437, 440, 444, 451), the ALJ limited him to a reduced exertional workload of light work. (R. 28). And while Dr. Palacci also found Plaintiff could perform knee squats (R. 292), the ALJ limited him to only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (R. 27-28).

Plaintiff's claim that the ALJ wrongly required his subjective complaints to jibe with every piece of evidence in the record is thus belied by the ALJ's explicit reasoning and result. But in any event, even if the ALJ had referred to an incorrect legal standard for evaluating Plaintiff's claimed symptoms (which he did not), Seventh Circuit authority makes clear that the use of such boilerplate "does not automatically undermine or discredit the ALJ's conclusion if he otherwise points to information that justifies his credibility determination." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013)).[9] The ALJ did so here. As explained below, the ALJ provided sound, well-supported reasons for his assessment of each claimed symptom or limitation that he did not fully credit, and in each case further explained why he credited it to the lesser extent that he did.

## 2. Symptoms Credited and Discredited

Plaintiff next complains that the ALJ failed to explain which symptoms he did and did not credit. (Doc. 10, at 12-13). But as discussed above, the ALJ made clear that he partially discredited Plaintiff's complaints of difficulty with prolonged standing and walking based on consultative and treating examinations that demonstrated a normal gait and no use of an assistive device (R. 292, 322), normal strength and range of motion in Plaintiff's lower extremities (R. 292, 321, 437, 440, 444, 451)), full ability to stand, and only 20% reduction in his capacity to walk. (R. 425). Based on this evidence, the ALJ reasonably

---

[9]     Indeed, the Seventh Circuit has affirmed ALJ decisions using the same "not entirely consistent" phrasing where the ALJ properly provided record-based reasons for the challenged symptom evaluation. *See*, *e.g.*, *Cooley*, 738 Fed. App'x 877, 880, 882 (7th Cir. 2018) (affirming assessment of fibromyalgia and other symptoms, including fatigue); *Reed v. Colvin*, 656 Fed. App'x 781, 786-88 (7th Cir 2016) ("the ALJ's credibility finding rests on a number of inconsistencies undermining Reed's complaints that her leg injury prevents her from working" and "thus is tied to evidence in the record and is not patently wrong, so we will not disturb that assessment").

found that Plaintiff "is able to stand or walk frequently during a normal workday." (R. 27-29). The ALJ also explained that he partially discredited Plaintiff's complaints of difficulty using his hands based on consultative and treating examinations indicating normal grip strength and full use of his hands and fingers (R. 292, 425), and only slightly reduced grip strength and mildly difficulty performing manipulations with either hand. (R. 321). After properly balancing these evaluations, the ALJ reasonably found Plaintiff "able to perform handling and fingering frequently, as opposed to occasionally." (R. 28-29).

Once again, Plaintiff confronts none of this evidence or the ALJ's careful consideration of it. Instead, Plaintiff points yet again to his unsubstantiated hearing testimony claiming that he spends half the day lying down (R. 54) and complains "there is no indication whether, or to what degree, the ALJ credited [Plaintiff's] need to lie down during the day due to his fatigue and weakness." (Doc. 10, at 13). But as explained above, while the ALJ found that Plaintiff may experience some fatigue as a symptom of his fibromyalgia, he reasonably discounted Plaintiff's claim that his fatigue is disabling (requiring him to lie down half the day) as inconsistent with the record, including Dr. Patricia Roy's December 2015 Medical Evaluation finding no physical impairment in Plaintiff's ability to handle daily activities during a normal 8-hour workday. (R. 28-29, 425). Dr. Estefan Roy similarly indicated no issue with daytime drowsiness a year earlier in December 2014. (R. 299). Given this evidence and the lack of any other indication that Plaintiff needed to spend time lying down during the day, the ALJ committed no error in rejecting that claim. *See Green v. Saul*, 781 Fed. App'x at 528 (no error in ALJ's failure to address in RFC claimant's alleged need to nap two hours every day due to fatigue that was "not supported by evidence other than her testimony," even though the medical record indicated she would experience "daytime sleepiness or drowsiness").

### 3.    Consideration of Objective Medical Evidence

Plaintiff's argument that the ALJ relied too heavily on his objective medical record fares no better.  According to Plaintiff, the ALJ wrongly focused on objective findings to discredit his claims of fibromyalgia-related pain and limitations, when "fibromyalgia is not manifested by typical objective findings."  (Doc. 10, at 13).  But as even Plaintiff acknowledges (*id.*), the ALJ gave due consideration to these claims by finding that Plaintiff's demonstration of all 18 fibromyalgia tender points "supports severe fibromyalgia."  (R. 27).  And while the ALJ also properly noted Plaintiff's normal knee, foot, hand, pelvis, and lumbar spine x-rays (R. 27), and normal examination findings showing full range of motion and strength in his upper and lower extremities (R. 27, 29), he did not rely on these objective findings alone when determining the extent of Plaintiff's limitations.  Rather, as discussed above, the ALJ also considered functional evaluations by both agency consultative examiners and Plaintiff's own treating physician showing a normal gait, no need for an assistive device, unimpaired or only mildly limited hand use, and full physical ability to conduct daily activities during a normal 8-hour workday.  (R. 27-29).  After properly balancing this evidence, the ALJ meaningfully credited Plaintiff's claimed limitations by restricting him to only light exertional work with frequent gross and fine manipulation and occasional climbing, balancing, stooping, kneeling, crouching, and crawling.  (R. 27-29).

Thus, the ALJ's decision shows that he thoroughly considered the many functional assessments in Plaintiff's record that indicated no or only minimal impairment, in combination with the many normal objective findings that also indicated lesser limitations than he alleged, to arrive at an RFC that was consistent with all of that evidence.  This

analysis was perfectly proper. *See Cooley*, 738 Fed. App'x at 882 (acknowledging in fibromyalgia case that "the consistency of [a claimant's] complaints with the medical record may be considered as probative of her credibility") (citing *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) ("discrepancies between objective medical evidence and self-reports may suggest symptom exaggeration")). But even if the ALJ had relied too heavily on normal objective findings (which he did not), that still would not "undermine" the considerable functional evidence that further supports the ALJ's RFC determination or require remand. *See Cooley*, 738 Fed. App'x at 882 ("any errors concerning the inconsistency of Cooley's complaints with the medical record do not undermine the evidence that does support the credibility determination. Thus, we cannot say the ALJ's decision was patently wrong").

### 4. Frequency of Gout Attacks

Plaintiff next contends that the ALJ "failed to determine the frequency and duration of gout attacks and the corresponding functional impact." (Doc. 10, at 14). But this too is inaccurate. As the ALJ observed, Plaintiff's six-year medical record includes just one blood test indicating a uric acid level above the normal range in May 2016 and one diagnosis of gout in October 2016. (R. 27). As for the functional impact of these findings, the ALJ further observed that Plaintiff's uric acid was normal when previously tested, undermining a conclusion of "persistent" gout. (R. 27-28). He also noted that "there have been significant periods since the application during which the claimant has not engaged in treatment or has not taken any medication for those symptoms," as Plaintiff reported at both consultative examinations (in September 2014 and June 2015) that he was not taking any prescription pain medications. (R. 28, 290, 318). The ALJ also cited Plaintiff's

testimony and report to Dr. Sequeira confirming that his medications had been at least somewhat effective in controlling his symptoms when he did have them. (R. 28, 51: "It calms down the actual, the swelling a little."; R. 449: "he felt better for about a month" after Elavil prescription).

Based on this evidence, the ALJ reasonably found that Plaintiff's gout and other impairments did not preclude full-time employment, but limited him to light exertional work to accommodate them. (R. 26-30). No additional predictions regarding the frequency or duration of Plaintiff's gout attacks were required. *See Craig v. Colvin*, No. 11-cv-2925, 2014 WL 7004970, at *3 (N.D. Ill. Dec. 11, 2014) ("there is no requirement that the ALJ determine precisely the number of times per year that a claimant experiences gout attacks"); *see also Burmester*, 920 F.3d at 509-10 (affirming light work RFC determination where claimant had gout and other impairments with no specific finding as to the frequency or duration of gout attacks).[10]

### 5. Conservative Treatment

Plaintiff's attempt to challenge the ALJ's consideration of his conservative and intermittent treatment is similarly unsupported. He complains that the ALJ failed to "explore" the reasons for his treatment history, such as when he had insurance, what it covered, and his difficulty getting to appointments due to dependence on his aunt for transportation. (Doc. 10, at 14). But all of these factors were thoroughly explored during

---

[10]  Contrary to Plaintiff's suggestion (Doc. 10, at 14), *Thomas v. Astrue*, No. 09 C 1219, 2011 WL 2039577 (N.D. Ill May 25, 2011), holds no differently. There, the ALJ improperly determined without medical support that the claimant's gout and other impairments were only "mild," and "went so far as to question whether they existed at all," despite confirming diagnoses and evidence of gout attacks every two weeks. *Id*. at *4, 10. The ALJ made no such improper pronouncement here. He merely noted (accurately) that Plaintiff's record contained only one blood test showing a high uric acid level and one diagnosed gout attack. (R. 27-28).

the hearing. In response to questions from the ALJ, Plaintiff testified about depending on his aunt for transportation to doctor's appointments (R. 44, 47, 54), and the ALJ appropriately noted that fact in his decision. (R. 29). Also during the ALJ's examination, Plaintiff explained that he had procured insurance about two and a half years before the hearing (so by the time of his July 2014 application) and that Dr. Patricia Roy took over when Dr. Habib no longer accepted that insurance. (R. 46, 48).

None of these facts undermines the ALJ's accurate observation that "there have been significant periods since the application during which the claimant has not engaged in treatment or has not taken any medication for those symptoms." (R. 28). As Plaintiff admitted, he had insurance throughout this timeframe and physicians were overseeing his care. (R. 46-48).[11] And while Plaintiff identified one period before his October 2016 gout diagnosis when his aunt was unable to take him to the doctor (R. 47), the ALJ's decision took full consideration of Plaintiff's treatment and diagnosis during this period and did not fault him for failing to procure it sooner. (R. 27). Rather, the ALJ accurately observed that there were other "significant periods" since Plaintiff's July 2014 application during which he did not engage in treatment or take pain medications for his symptoms, as he reported in both September 2014 and June 2015. (R. 28, citing 290, 318). *See Summers v. Colvin*, 634 Fed. App'x 590, 592 (7th Cir. 2016) (claimant's "explanation that she did not have insurance or reliable transportation" failed to "address her circumstances during the period" of conservative treatment noted by the ALJ).

---

[11] The court also notes that Plaintiff regularly presented for doctors' appointments and emergency room visits between December 2014 and November 2016, indicating that he was able to seek care throughout this timeframe. *See* R. 298-99: 12/18/14; R. 391: 5/5/15; R. 312-14: 5/19/15; R. 435-40: 6/23/15; R. 386: 6/24/15; R. 443-47: 7/9/15; R. 449-54: 10/13/15; R. 366-68: 10/20/15; R. 348: 11/16/15; R. 422-25, 465: 12/16/15; R. 455-58: 3/3/16; R. 464: 5/10/16; R. 411-12: 10/10/16; R. 463: 10/18/16; R. 462: 11/14/16.

### 6.     SSR 16-3p

Plaintiff's argument that the ALJ failed to address the credibility factors required by SSR 16-3p similarly disregards his detailed decision.  Contrary to Plaintiff's assertion (Doc. 10, at 14-15), the ALJ carefully considered the medications Plaintiff has taken over time, including narcotic pain medication.[12]  But the ALJ also noted that Plaintiff "has not used high-grade pain medications regularly" (R. 29) and was using not such prescriptions at his consultative examinations in September 2014 and June 2015.  (R. 28).  Given this and Plaintiff's relative improvement when using medications as prescribed, the ALJ reasonably determined that his impairments do not preclude light exertional work.  (R. 23, 28-30; *see also* R. 366-68: reports to Dr. Habib - "Much better overall" and "pain is better" after Levaquin prescription; R. 447-49: reports to Dr. Sequeira - "He feels a little better with Naprosyn" and "felt better for about a month" after Elavil in addition to Naprosyn).  Plaintiff's further criticism that the ALJ overstated the effectiveness of his medications is also unpersuasive.  (Doc. 10, at 15).  Consistent with Plaintiff's reports to Dr. Sequeira and Habib of feeling better after various prescriptions (R. 366-68, 447-49), and his testimony that arthritis medication calms his swelling "a little" (R. 51), the ALJ found Plaintiff's medications "relieved his swelling" and were "somewhat effective" and "relatively effective in controlling his symptoms."  (R. 28-29).

The ALJ also considered Plaintiff's claims of diminished daily activities due to fatigue (R. 29) and difficulties performing daily activities independently (R. 26), and addressed a note submitted by Plaintiff's aunt explaining that she "helps him with some

---

[12]     *See* R. 24 ("The Claimant has previously used Cipro and Norco but no longer has active prescriptions for these."); R. 27 ("In October 2016, treating sources diagnosed gout and prescribed allopurinol. . . . At various times, the claimant has used cyclobenzaprine, amitriptyline [Elavil], gabapentin, tramadol, and meclizine.").

of his daily activities like cooking, cleaning, and taking him back and forth to the doctor."

(R. 26, 245). But given Plaintiff's conservative treatment, intermittent use of prescription

pain medication, radiography indicating normal or mildly impaired extremities, and

"generally unremarkable physical examinations," the ALJ reasonably found Plaintiff's

alleged impairments not as severe as alleged. (R. 26-30). Although Plaintiff may

disagree with that assessment, this Court may not "reweigh evidence, resolve conflicts,

decide questions of credibility, or substitute its judgment for that of the Commissioner."

*Burmester*, 920 F.3d at 510 (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539

(7th Cir. 2003) (brackets omitted).[13]

### 7.   Symptom Exaggeration

Finally, Plaintiff argues that the ALJ misconstrued one of Dr. Sequeira's treatment

records noting a "[d]ubious muscle strength exam" (R. 444) as "evidence that the claimant

put forth less than maximal effort during examination." (R. 28). According to Plaintiff, this

"perceived inconsistency" is unsupported because Plaintiff ultimately demonstrated full

muscle strength during this exam. (Doc. 10, at 15). But as even Plaintiff concedes, the

note indicates at least "some question of strength testing." *Id*. And other portions of the

same report raise similar questions. After noting full strength and range of motion in

Plaintiff's upper and lower extremities, no edema, essentially normal x-rays of his upper

and lower extremities, pelvis, and lumbar spine, and blood tests that also showed no sign

---

[13]    Plaintiff also suggests that the ALJ failed to consider any aggravating or precipitating factors, but fails to identify any such factors that the ALJ overlooked. (Doc. 10, at 15). In any event, the ALJ's thorough examination of Plaintiff during the hearing regarding his claimed symptoms and limitations (R. 43-54) and the additional questioning by his counsel (R. 54-59) were sufficient to demonstrates that the ALJ took any such potential factors into account. *See Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("The hearing transcripts show that he heard extensive testimony from Prochaska regarding her allegations of aggravating factors, even if he did not discuss those allegations in his opinion.").

of an autoimmune disorder, this record stated that the etiology of Plaintiff's joint pain was "unidentifiable" and recommended that he increase his activity level with, among other things, walking. (R. 444-47). And while Dr. Sequeira also stated that Plaintiff's diffuse tender points were "consistent with fibromyalgia" (R. 447), it was not unreasonable for the ALJ to construe this report as implying some doubt about his claimed symptoms.

Other records do the same. Despite persistent complaints of muscle weakness (R. 313, 436, 450, 456), Plaintiff's treating and examining physicians repeatedly found full muscle strength and range of motion in all extremities. (R. 292, 321, 437, 440, 444, 451, 457). He has made widely inconsistent statements about the distance he is able to walk without resting. (R. 210: 7 steps; R. 194: 20 feet; R. 318: a half block; R. 437, 440, 449: a block; R. 53: a quarter mile). He testified that he is unable to perform manual tasks like buttoning a shirt that he was able to do during his first consultative examination (R. 55, 291) and even after his treating physician reported no impairment in the use of his hands or fingers over a year later. (R. 425). And both agency reviewers found Plaintiff's claimed symptoms "significantly more limiting" than the evidence suggested. (R. 68, 76). On this record, the Court finds no error in the ALJ's inference that Plaintiff "put forth less than full effort during examinations" or his conclusion that Plaintiff's limitations are not as limiting as he alleged. (R. 28-30).[14]

---

[14]    *See Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018) (ALJ's credibility assessment supported by substantial evidence where claimant made inconsistent statements about his limitations, his presentation of symptoms was inconsistent with multiple doctors finding a normal gait and range of motion, and one of his physical therapy records stated that he was "self-limiting" and "exaggerated" the severity of his pain); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) ("The ALJ reasonably discounted Mr. Getch's testimony given the discrepancy between his reports of disabling gout and medical reports documenting Mr. Getch's normal range of motion, ability to walk and stand without significant limitation, and absence of joint swelling or other gout symptoms. It therefore was not patently wrong for the ALJ to conclude that, although Mr. Getch's impairments were real, he had exaggerated their impact on his ability to work.").

## CONCLUSION

For the foregoing reasons, Plaintiff Frank B's request that the ALJ's decision denying his claim for SSI benefits be reversed or remanded for further proceedings (Doc. 10) is denied, and the Commissioner's motion for summary judgment asking that the decision be affirmed (Doc. 18) is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: November 25, 2019

SHEILA FINNEGAN
United States Magistrate Judge